IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

SHERRY WENZ,

        Plaintiff,

vs.                                                                   Civil No. 04-1020 WJ/DJS

VANTAGE BUILDERS, INC.,
RAYLEE HOMES, INC., and
JOHN EBERLE,

        Defendants.

## MEMORANDUM OPINION AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment (Doc. 29).  Having reviewed the submissions of the parties and the relevant law, I find the motion shall be granted in part and denied in part as set forth in this Memorandum Opinion and Order.

**BACKGROUND**

On September 10, 2004, Plaintiff filed her Complaint in this case.  Named as Defendants are Vantage Homes, Inc. (Vantage), Raylee Homes, Inc. (Raylee) and John Eberle.  The Complaint alleges claims for (1) harassment on the basis of gender under Title VII in Count I; (2) harassment on the basis of age under the ADEA in Count II; (3) age discrimination under the ADEA in Count III; (4) retaliation under Title VII and/or the ADEA in Count IV; (5) tortious interference with business relations under New Mexico state law in Count V; and (6) unjust enrichment under New Mexico law in Count VI.  Defendants filed the instant motion for summary judgment arguing that Plaintiff's harassment claims should be dismissed because the alleged

harassment was not severe or pervasive enough to alter the terms, conditions or privileges of Plaintiff's employment and because the alleged harassment, assuming it occurred, was not because of age or gender.  Defendants argue that Plaintiff's age discrimination claim should be dismissed because the conduct alleged to be discriminatory was taken for legitimate reasons and was not a pretext for discrimination.  As for Plaintiff's retaliation claim, Defendants assert that Plaintiff did not engage in protected activity and did not suffer an adverse employment action.  Defendants argue that Plaintiff's claim for interference with a business relationship must fail because Defendant Eberle, as Plaintiff's supervisor, acted as an agent for Raylee and Vantage, Plaintiff's employers, and could not tortiously interfere with contractual relations between Plaintiff and Raylee/ Vantage.  Finally, Defendants urge that Plaintiff's claim for unjust enrichment must be dismissed because it is an equitable remedy and Plaintiff has an adequate remedy at law.

Viewing the evidence in a light most favorable to Plaintiff, as the Court must in deciding a motion for summary judgment, the pertinent facts may be summarized as follows.

Defendants Vantage and Raylee are corporations engaged in, among other things, the business of building and selling homes in New Mexico.  Vincent Pizzonia and Scott Grady are co-owners of Vantage.  Scott Grady owns Raylee, and Vincent Pizzonia has no position or interest in Raylee.

Plaintiff Sherry Wenz began working as a sales agent for Vantage on or about November 2, 2002.  Plaintiff was a top producer in new home sales for Vantage in 2003 and was the top salesperson at Vantage in the fall of 2003.  Plaintiff's date of birth is August 26, 1951, and she was 51 years old at the time she was hired.  Plaintiff signed an employment contract with Vantage to be a licensed real estate salesperson for the period between February 3, 2003 through January

2

1, 2004.  This contract provided that Vantage could assign Plaintiff to a particular tract or real estate subdivision, but did not provide that Plaintiff had any employment relationship with Raylee or that Plaintiff could be assigned to a Raylee tract or real estate subdivision.  Plaintiff was assigned to a Vantage subdivision on Albuquerque's West Side called the Arenal/Ventana Ranch Subdivision (Ventana).

When Plaintiff was hired, her immediate supervisor was Barbara Domingues.  At that time, Defendant Eberle was the sales manager for Raylee and had no supervisory authority over Plaintiff.  In May or June of 2003, Eberle was appointed sales manager for both Raylee and Vantage and became Plaintiff's supervisor.

Plaintiff testified at her deposition that, before Eberle became Plaintiff's supervisor, he told his daughter, who then told Plaintiff, that Plaintiff "was going to be some older bitch that was going to come in there and show everybody up."[1]  Regarding this comment, Plaintiff testified that "it didn't matter to me, he wasn't my boss, so I could care less."  Eberle told another person, Janie Littles, who then told Plaintiff, to watch out for Plaintiff, that Plaintiff was trouble, and to stay away from Plaintiff.[2]  Regarding this comment, Plaintiff testified, "he wasn't my manager, if he wants to bad mouth me, let him bad mouth me, it didn't bother me, you know, it didn't affect my job."  Brenda Hardy, a former employee of Vantage, avers that Eberle's daughter told her that

---

[1]This fact is gleaned from Defendants' Undisputed Material Facts (UMF) to which Plaintiff did not object.  This UMF is based on Plaintiff's deposition testimony that she was told by Eberle's daughter that Eberle made this remark.  Defendants assert that this is hearsay and should not be considered by the Court for purposes of summary judgment.

[2]This fact is taken from Defendants' UMF to which Plaintiff did not object and is based on Plaintiff's testimony that she was told by Ms. Littles that Eberle made this statement.  Defendants asserty that this is hearsay and cannot be considered by the Court for purposes of summary judgment.

Eberle had said not to form a relationship with Plaintiff because Plaintiff was too old to relate to younger employees.[3]

From June of 2003, when Eberle became Plaintiff's supervisor, until the end of August or early September, the relationship between Plaintiff and Eberle proceeded on a professional basis. Plaintiff testified at her deposition that Eberle began making remarks and comments about her beginning in late August or early September 2003.  According to Plaintiff, Eberle remarked to Charles Gregory, a sales agent, "I'm really dreading going out to visit that old cow at Ventana.  I really have to get myself geared up for her."[4]  Also in September, Scott Grady, President of Raylee, asked Plaintiff to share the secret of her success with her coworkers.  A week or so later, Eberle sat down with Plaintiff and said, "Oh, I understand the old dog is going to teach the new dog new tricks."  Plaintiff responded by saying, "Excuse me," and Eberle replied, "Scott [Grady] said that you would be willing to share the secret of your success. . . . We will see about that." Plaintiff laughed off Eberle's statement and did not further respond to it, but she found it disturbing and was concerned because she did not want to get in trouble.

A meeting was held for sales personnel at which Eberle announced new subdivision assignments.  At the meeting, Eberle stated, "I hate to have to do this to you, Ralph, but you're going to have to work with Sherry."  Plaintiff testified that this statement hurt her feelings, but she laughed it off and didn't say anything at the time because she did not want anyone to think she

---

[3]This is gleaned from Plaintiff's Disputed Material Facts (DMF).  This DMF is based on the affidavit of Brenda Hardy in which she relays a statement made by Eberle's daughter regarding a statement by Eberle.  Defendants' Motion for Summary Judgment argues that hearsay testimony such as this cannot be considered by the Court on the motion.

[4]This is taken from the affidavit of Charles Gregory to whom Defendant Eberle allegedly made the statement.  Accordingly, the statement is not hearsay.

was weak.  At another meeting, the sales personnel were discussing a misunderstanding regarding the school district in which a particular subdivision lay.  During the discussion, Eberle said, " . . . [Sherry] doesn't do her homework and she doesn't prepare."  In response to this comment, Plaintiff did not say anything because she did not want to embarrass Eberle in front of all the other sales people.  At yet another meeting, Eberle said that sales agents were going to be responsible for general cleaning and light maintenance in the model homes explaining that, if necessary, "you're going to have to get up on a ladder and do it."  Plaintiff told Eberle that she could not get up on a ladder due to a bad knee.  Eberle responded, "Sherry, you'll have to get somebody else to do it because if you don't do it, you'll be terminated."

Plaintiff remembers no other specific statements made by Eberle either to Plaintiff or regarding Plaintiff other than the specific remarks detailed above and those he made to her when he fired her as described below.  However, Plaintiff testified that Eberle made "other little remarks here and there about certain things."  Wenz depo. p. 9-10.  Former Vantage sales agent Charles Gregory avers that Eberle displayed open hostility toward Plaintiff at sales meetings and attempted to humiliate and ridicule Plaintiff in front of all the other sales associates.  Current Vantage/Raylee employee Michael Carter attests that Eberle used harsh and threatening words and acted in a harsh and threatening manner toward him, that he had observed Eberle behaving improperly in the work place, and that he witnessed Eberle behave in a rude, profane and abusive manner during the period of Plaintiff's employment.

In July 2003, Plaintiff had approached Mr. Pizzonia and expressed a desire to be assigned to a subdivision closer to her home in the Northeast Heights if one became available.  Mr. Pizzonia told Plaintiff that Vantage was negotiating for some land and told Plaintiff to hang in

there.  Plaintiff informed Eberle of her conversation with Pizzonia.  In September 2003, Eberle informed Plaintiff that she was going to be transferred from the Ventana Subdivision to a new Raylee subdivision in the Northeast Heights.  Plaintiff told Eberle she was waiting for a Vantage subdivision, but Eberle told her she was going to the Raylee subdivision whether she liked it or not.  Plaintiff informed Eberle that she was comfortable with the Ventana Subdivision and did not want to be moved, but Eberle said, "Sorry, the decision has been made - you're out."

Plaintiff was transferred to the Raylee development even though it was not ready to be sold and even though she had no employment agreement with Raylee.  Eberle transferred another saleswoman, Nicole Calderon, into the Ventana Subdivision to replace Plaintiff.  Calderon had significantly fewer sales than Plaintiff by the fall of 2003 - Plaintiff had sold 55 houses by October 2003 and Calderon had sold only 17.  Plaintiff's customer satisfaction results were an average of 88.26% while Calderon's average was 64.57%.  Eberle stated in his deposition that Calderon's customer satisfaction results were "alarmingly low."  In addition to working in sales, Calderon had been given a $500 bonus with the company for working as Eberle's assistant, but nobody else had been offered an opportunity to work as Eberle's assistant.

In October, Eberle told Plaintiff that Calderon was eager to get started on sales at Ventana and asked if Plaintiff would take a vacation from November 1, 2003 through November 15, 2003 so that Calderon could go ahead and move to Ventana.  Eberle told Plaintiff that Trementina, the new Raylee subdivision in the Northeast Heights, would be ready for sales on November 15. Plaintiff asked Eberle to put in writing his promise that Trementina would be ready by November 15, but Eberle declined and told Plaintiff she would have to trust him. When Plaintiff returned from her vacation, Trementina was not ready for sales.  Defendants assert that Plaintiff could have

6

done many things to start selling in Trementina before it was open, but Plaintiff disputes this assertion.

After Plaintiff returned from her vacation, Eberle told her it would be a few more days before Trementina was ready.  While there was a trailer on the site, it had no furniture and no heat.  There was no access to the site, no signs and no flags.  Plaintiff had no business cards and no price list.  On December 7, Plaintiff was given keys to the trailer, the price list, and the "Standards of Excellence."  Later during the week of December 7, furniture was delivered to the trailer.

On December 15, Trementina was still not open.  A sales meeting was scheduled that day, and Plaintiff went early to speak with Eberle.  She told him that she had had enough, that she had been out of work for six weeks, and that she was not going to put up with that treatment any longer.  Eberle offered to transfer Plaintiff to Desert Sage, a subdivision in the south valley.  Plaintiff said she didn't know whether she wanted to go to Desert Sage.

On December 15, 2003 Plaintiff wrote a letter to Mr. Pizzonia detailing her transfer to Trementina before it was ready for sales and expressing frustration over her premature transfer.  Plaintiff asked the reasons for the premature transfer specifically stating, "is it my age? Is it my weight?"  Plaintiff delivered the letter to Mr. Pizzonia's office on December 15.  She states that she addressed the letter to Mr. Pizzonia and hand-delivered it to his office because of Eberle's discrimination toward her.  Plaintiff placed the letter on Mr. Pizzonia's chair because she was afraid that Eberle would get to the letter.

Eberle saw the letter in Mr. Pizzonia's office.  He went to Scott Grady and told him there was a letter from Plaintiff in Pizzonia's office that appeared to be a resignation letter.  Eberle

removed the letter from Pizzonia's office, Grady opened the letter, and Grady and Eberle read the letter.  With regard to Plaintiff's concerns that Calderon was receiving preferential treatment and that Plaintiff's age or weight might be the reasons for Plaintiff's premature transfer, Grady thought these were fabricated allegations - "a bunch of crap."  Grady depo. p. 63:3.  Eberle was upset by the letter but did not suggest that Plaintiff's employment be terminated.  At the time, Plaintiff did not have an employment contract with Raylee but only with Vantage.

Grady set up a meeting with Plaintiff and Eberle on December 18, 2003 to discuss the issues raised in Plaintiff's letter.  At the meeting, Grady did not address Plaintiff's concern that Calderon had been treated preferentially or Plaintiff's question as to whether she had been prematurely transferred because of her age or her weight.  Grady told Plaintiff that he did not want to lose her as a valuable employee and told her that Trementina would get off the ground soon.  Plaintiff was given Trementina business cards at this meeting.  Plaintiff thought that the meeting had gone well, that both Grady and Eberle were being sincere, and that everything was going to be resolved.

Following the December 18 meeting, Plaintiff turned in a "Salesperson Employment Agreement" with Raylee for the period of January 1, 2004 through January 1, 2005.  Mr. Grady acknowledges that Plaintiff was not legally a Raylee employee until she signed the new contract with Raylee.  Mr. Pizzonia testified at his deposition that Plaintiff should have been given an employment contract with Raylee when she was transferred from a Vantage to a Raylee development in the Fall of 2003.

On December 26, Plaintiff confirmed that gas had been delivered and the heat was on at the Trementina trailer.  On December 29, 2003, Plaintiff met with Grady again about delays with

the Trementina development.  At this meeting, Plaintiff received confirmation that flags had been

ordered, and the location of the signs was determined for the Louisiana and Paseo del Norte

intersection.

On January 3, 2004, the opening day for Trementina, Plaintiff went to work at the

Trementina subdivision around 8:00 or 8:30 am.  Eberle went to Trementina around 9:00 a.m.

Mr. Eberle testified that he went there to make sure that the flags and signs he had put up were

still in place and to see how Plaintiff was doing.  Plaintiff expressed to Eberle that "nothing that

was -- I was promised has been done."  Wenz depo. p. 187.  Eberle responded by saying "These

things take time."  Id.  Plaintiff then said "This is my living we are talking about.  I can't make

money you know.  Well, now, what were all these promises that Scott [Grady] gave to us last

week, was it just lip service to shut me up?"  Id. at 187-88.  Eberle responded by stating "I can

sense this meeting is basically going nowhere" and left the trailer.  Id. at 188.

After Eberle left the trailer, Plaintiff called Grady and left a message on his voicemail in

which she stated that none of the things he had promised had happened.  Plaintiff did not mention

any concerns about discrimination in her message to Grady.  Plaintiff then called Eberle on his cell

phone and left a voicemail message stating that she wanted to go back to Ventana and stating

"You guys are fooling around."  Wenz depo. p. 195:1-16.  An hour or so later, Eberle came back

to Trementina.  When he arrived, Plaintiff was talking with some people that lived in the area and

was giving them a rundown on what was going to be built and prices.  Eberle went into another

office within the trailer to wait.  As soon as the first people left, another set of neighbors came in

and Plaintiff gave them a presentation.

After these people left, Eberle came to Plaintiff and was confrontational stating, "How dare you call me and say what you said to me." Id. at 195. Plaintiff responded saying, "John, I don't want to discuss it with you. I have got a call in to Scott Grady, I'm going to discuss it with Scott. . . . I'm not going to discuss it with you, I get no place with you, all you are is abusive to me and you treat me badly, and I am not going to do it anymore. I have had enough now. You have been working for months on making a disgruntled employee, you now have gotten your wish, I am disgruntled, and I will file a grievance with Scott Grady. I have already called him." Id.

Eberle then told Plaintiff, "How dare you call Scott, you fucking bitch." Id. Eberle informed Plaintiff that Scott [Grady] and Vinny [Pizzonia] had told him to fire her. She responded, "Well, if they told you to fire me, why didn't you fire me?" Id. at 197. Eberle then said, "That's it. You are fired, get the fuck out of here." Id.

The first sale in the Trementina subdivision was not made until February 18, 2004. Plaintiff acknowledges that Trementina turned out to be a "plum" subdivision. Id. at 257.

After Plaintiff was fired, Grady was under the impression that Plaintiff had resigned rather than been fired. Pizzonia testified at his deposition that he believed Eberle had fired Plaintiff after she had walked out of the trailer at Trementina saying she was leaving. However, Pizzonia told others that Plaintiff had resigned and that he missed her.

Defendants contend that Plaintiff was fired for insubordination. According to Mr. Pizzonia, Plaintiff was insubordinate to her first supervisor, Ms. Domingues, and he disciplined her for this by calling both Plaintiff and Ms. Dominguez into his office and telling them to cut it out. Plaintiff does not dispute Defendants' contentions with regard to Ms. Domingues. Nor does

Plaintiff dispute that she once confronted Mr. Grady at a sales meeting, was abrasive, somewhat incorrigible and resisted authority.  However, Plaintiff does dispute that she was fired for insubordination.  She notes that her termination letter stated nothing about insubordination and her personnel file makes no mention of any discipline, reprimand or termination for insubordination.

Defendants assert that Plaintiff herself was vulgar and profane and that she once made a comment about the size of Mr. Pizzonia's "package."  Plaintiff disputes this but acknowledges that profanity is prevalent in the construction industry, that she herself used profanity, and that profanity does not bother her.  Plaintiff does not allege that Eberle ever said anything of a sexual nature to her.  In any event, she testified that it is hard for sexual comments to make a person in the construction industry uncomfortable, and that women in the construction industry are inured to such talk.

Defendants contend that Plaintiff never complained about Eberle's allegedly abusive conduct.  Defendants note that they have a "Harassment and Sexual Harassment Policy" that requires complaints of harassment or discrimination to be reported.  Plaintiff disputes that she never complained about Eberle's conduct.  She asserts that her December 15, 2003 letter to Mr. Pizzonia raised the issue of Eberle's conduct.  Additionally, Plaintiff maintains that Defendants had knowledge of Eberle's treatment of employees after an anonymous survey in which some employees commented that Eberle played favorites with salespeople, was rude and mean, talked down to people, and was lacking in all strengths.

With regard to the "Harassment and Sexual Harassment Policy," Plaintiff contends that the policy purported to (1) provide a working environment free of discriminatory intimidation

and/or sexual harassment; (2) identify complaint procedures; and (3) outline disciplinary penalties that may be imposed for discriminatory or harassing conduct.  Plaintiff notes that the policy states that discrimination or harassment should be reported and requires the employer to conduct a "prompt and careful investigation of the matter"  when there is a report of discrimination or harassment.

On February 10, 2004, after Plaintiff's employment was terminated, Plaintiff's counsel sent a letter to Mr. Grady and Mr. Pizzonia alleging that Eberle's treatment of Plaintiff was discriminatory.  On February 20, 2004, Defendants' counsel sent a responsive letter to Plaintiff's counsel which stated that the issues raised in Plaintiff's letter had been thoroughly considered by Defendants, that Defendants found no material substance to Plaintiff's allegations, and that there would be no offer to reinstate Plaintiff's employment.  On February 24, 2004, Plaintiff's counsel sent a letter to Defendants' counsel questioning whether the employment policies and procedures were followed and whether Defendants could demonstrate that a complete investigation of Plaintiff's allegations had been conducted.  During discovery in this case, Defendants' produced questionnaires given to employees asking each of them if Eberle had harassed them.  These questionnaires stated the company policy against harassment.  These questionnaires required employees to sign and date their responses.  Two employees responded that Eberle had harassed them.  These responses were dated February 26, 2004.  According to Plaintiff, Defendants failed to investigate her complaint.  She notes that Mr. Grady, an owner of the company, was not even sure whether the policy was in place during Plaintiff's employment but acknowledged that, if it was in place, it would be important to follow the policy with regard to a report of discrimination or harassment.

Defendants assert that the delays at Trementina were unfortunate, but that Raylee was subject to the schedule of the developer.  Defendants state that Plaintiff was not the first agent with Raylee or Vantage who had been asked to sell in a subdivision when there was very little ready for sales.  Plaintiff disputes this contention.

Defendants note that, in spite of Plaintiff's allegations with regard to Eberle, Plaintiff invited everybody she worked with, including Eberle, to her Christmas party in December 2003, that she sang a song with him, and that she was arm in arm with him while they sang.  Plaintiff testified that she was not uncomfortable with or initimidated by this contact because there were a lot of people present at the party.

Plaintiff's employment compensation included sales commissions.  According to Plaintiff, her 2003 employment agreement with Vantage Homes which paid commissions for upgrades above the base price of a home applies to homes sold in 2003 even if they did not close until 2004.  Plaintiff attests that, after she signed her 2004 contract, Defendants announced that the 2004 contract would apply to homes sold in 2003 that closed in 2004 and that commissions would be calculated on the base price only without including upgrades.  Plaintiff advances that Defendants owe her commissions for upgrades on homes she sold in 2003 that closed in 2004.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000).  The burden of showing an absence of a genuine issue of material fact falls upon the moving party.  See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  However, when the moving party does not bear the ultimate burden of

persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671. The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In ruling on a motion for summary judgment, a Court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998). In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party. Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228. In setting forth facts, the nonmoving party need not present evidence in a form admissible at trial, but the content or substance of the evidence must be admissible. Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000). Thus, hearsay testimony cannot be considered. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).

**DISCUSSION**

I.     EXTRANEOUS EVIDENCE

Plaintiff's Response to the Motion for Summary Judgment presents facts regarding Defendants' alleged failure to investigate her charges of discrimination made after her termination. Additionally, in preliminary argument, Plaintiff argues that Defendants did not investigate her

14

post-termination charges of discrimination.  However, Plaintiff does not show how this evidence

specifically affects one or more of her claims.

If the Court were amenable to speculating, the Court might attempt to analyze this alleged

failure to investigate as (1) an alleged adverse employment action; (2) possible evidence of

discrimination; (3) potential evidence of harassment; (4) possible evidence of retaliation;  or (4)

evidence with a possible tendency to show pretext.  However, Plaintiff gave the Court no road

map on where or how to apply this evidence, and the Court is not inclined to make guesses.

Accordingly, the evidence is not further analyzed in the Court's decision.

I.      PLAINTIFF'S CLAIMS OF HARASSMENT ON THE BASIS OF GENDER

Title VII forbids actions taken on the basis of gender that "discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment."

Faragher v. Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)).   Hostile

work environment harassment occurs when unwelcome sexual conduct "'unreasonably

interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or

offensive working environment.'"  Smith v. Norwest Financial Acceptance, Inc.,129 F.3d 1408,

1412 (10th Cir. 1997) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); 29

C.F.R. S 1604.11(a)(3).  Meritor states that "[f]or sexual harassment to be actionable, it must be

sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an

abusive working environment.'"  477 U.S. at 67 (citation omitted).  There is no "mathematically

precise test" for determining whether conduct is sufficiently severe or pervasive.  Harris v.

Forklift Sys., Inc., 510 U.S. 17, 22 (1993).  In order to determine whether conduct was

sufficiently severe or pervasive enough to be actionable sexual or gender harassment, a court must

consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity;  whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.  Cadena v. The Pacesetter Corp., 18 F.Supp.2d 1220, 1226 (D.Kan.1998).   In considering these factors, a court also must consider the context in which the conduct occurred.  Id.   Additionally, the conduct complained of must be discriminatory in that the conduct is aimed at Plaintiff because of her gender.  See 42 U.S.C. § 2000e-2(a)(1).  While the conduct need not be overtly sexual in nature, see Stinnett v. Safeway, Inc., 337 F.3d 1213 (10th Cir. 2003), it must be related to Plaintiff's gender, see Riske v. King Soopers, 366 F.3d 1085, 1091 (10th Cir. 2004).  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir.1994).

A plaintiff may also bring a claim under the ADEA for a hostile work environment on the basis of age.  See MacKenzie vs. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005).  As with a sexual harassment claim, a plaintiff claiming a hostile work environment based on age must show that unwelcome age-related conduct unreasonably interfered with her work performance or created an intimidating, hostile or offensive working environment and that the harassment was sufficiently severe or pervasive to alter the conditions of her employment.  See Id. Additionally, Plaintiff must show that the nature of the environment is due to her age, that is, that the hostile environment is a result of age discrimination.  See 29 U.S.C. § 621 et seq.; Stahl, 19 F.3d at 538; see, also Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998) (stating that a prima facie case of hostile work environment on the basis of race requires a plaintiff to

show that (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus).

In order for a plaintiff to have an actionable hostile work environment claim under Title VII or the ADEA, the work environment must be both objectively and subjectively hostile. Harris, 510 U.S. at 21-22. In other words, the environment must be one that a reasonable person in the plaintiff's position would find hostile or abusive, and one that the victim did in fact perceive to be so. Faragher, 524 U.S. at 786-87; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  In evaluating hostility based on age or gender,  the Supreme Court has instructed courts to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of age or gender-related jokes, and occasional teasing.  Id. at 1280 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  "This screening is in place to ensure that Congressional enactments such as the ADEA [and Title VII] do not become trivialized as a civility code."  Id.

Defendants argue that Plaintiff's harassment claims under Title VII and the ADEA must fail because the alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.  Plaintiff argues that she has provided more than ample evidence of Eberle's discriminatory and abusive behavior.

Some of Plaintiff's evidence is hearsay and will not be considered by the Court for purposes of summary judgment.  Her evidence that Eberle referred to her as an "older bitch," that she was "trouble," and that she was "too old to relate to younger employees" is all hearsay.  Considering the remainder of Plaintiff's evidence, she has shown that (1) Eberle referred to her as "that old cow;" (2) that he made a statement in reference to her about "the old dog" teaching others new tricks; (3) that, in the presence of the other sales personnel at a meeting, he apologized

to another sales person for making him work with Plaintiff; (4) that he told everyone at a sales meeting that Plaintiff does not do her homework and does not prepare; and (5) that he told Plaintiff in a sales meeting that she would be terminated if she did not do or arrange to have done the light maintenance in model homes.

Plaintiff has also shown that Eberle displayed open hostility toward her in meetings and attempted to humiliate and ridicule her.  Her evidence is clear that at least two other employees felt that Eberle's general conduct in the workplace was harsh, threatening, humiliating, intimidating and wrathful.  When Eberle fired Plaintiff, he called her a "fucking bitch" and told her to "get the fuck out" of there.  Plaintiff's testimony is that, in addition to these specific comments and concerns, Eberle made ongoing remarks about various things.

The conduct of which Plaintiff complains was not pervasive in that the dozen or so incidents occurred over a period of more than a year, and Eberle was not Plaintiff's supervisor during much of this period.  While the Court does not condone Eberle's boorish conduct, it was not sufficiently severe to create a hostile work environment under Title VII or the ADEA.  It was not physically threatening, was not overly humiliating and, based on reports from other employees that Eberle was generally rude and abusive, was not necessarily directed toward Plaintiff.  There is also no evidence that this conduct unreasonably interfered with Plaintiff's work performance.  Finally, there is evidence that Plaintiff did not find all of this conduct objectively hostile or abusive.  Plaintiff's own testimony is that the comments made by Eberle before he became her supervisor did not bother her and that a comment made after he became her supervisor merely "hurt her feelings."  Plaintiff's evidence does not show harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and

18

Defendants are thus entitled to summary judgment on Plaintiff's harassment claims under Title VII and the ADEA in Counts I and II.

Even if Plaintiff's evidence showed harassment that was sufficiently severe or pervasive to survive summary judgment, Plaintiff's evidence fails to show that this conduct was aimed at her because of her age and/or gender.  See Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination . . . because of . . . sex."); Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir.1999) ("persistent cursing and use of abusive language" is not harassment where there is nothing "inherently. . . discriminatory" about the comments); Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 965 (8th Cir.1999) (affirming summary judgment in a sexual harassment case because cursing and "rude and snotty" behavior was not based on plaintiff's sex); Holtz v. Marcus Theatres Corp., 31 F.Supp.2d 1139 (N.D.Ill.1999) ("Merely yelling at female employees and calling them names does not rise to the level of an actionable hostile work environment"). The only conduct that could be even remotely construed as gender related is Eberle's statements containing the words "bitch" and "cow."  With regard to age related conduct, the admissible evidence does show that Eberle referred to Plaintiff as an "old cow" and an "old dog."  It also shows that he told her she would be terminated if she did not complete light maintenance on model homes because of a bad knee that prevented her from climbing ladders. However, these isolated remarks are insufficient to show that Eberle engaged in a pattern of harassing conduct directed at Plaintiff because of her gender or age.  Additionally, the evidence shows that Eberle directed similarly rude and abusive conduct toward both males and females.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's harassment claims in

Counts I and II.

II.     PLAINTIFF'S AGE DISCRIMINATION CLAIM

In evaluating ADEA claims, the Tenth Circuit uses the three-stage analysis outlined in

McDonnell Douglas. Rivera v. City and County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).

The McDonnell Douglas test involves a three-step analysis. First, the plaintiff must prove a prima

facie case of discrimination. If the plaintiff satisfies the prima facie requirements, the defendant

bears the burden of producing a legitimate, nondiscriminatory reason for its action. If the

defendant does so, the plaintiff must either show that her age, gender, or other illegal

consideration was a determinative factor in the defendants' employment decision, or show that the

defendants' explanation for its action was merely a pretext. See Kendrick v. Penske Transp.

Servs., Inc., 220 F.3d 1220, 1226 (10th Cir.2000).  In order to prove a prima facie case of

discrimination, a plaintiff must show: "(1) she is a member of the class protected by the statute;

(2) she suffered an adverse employment action; and (3) that the adverse employment action

occurred under circumstances giving rise to an inference of discrimination.  Hysten v. Burlington

Norther & Santa Fe Ry. Co., 296 F.3d 1177, 1180 (10th Cir. 2002) (noting that the third prong is

ordinarily satisfied by proof that the employer treated similarly situated employees more

favorably, but stressing that courts must be sensitive to the many ways an inference of

discrimination may be shown).

Defendants do not dispute that Plaintiff is a member of a protected class.  For purposes of

their motion for summary judgment, Defendants also do not dispute that Plaintiff has sufficient

evidence to show that there are circumstances giving rise to an inference of discrimination

20

because they acknowledge that Plaintiff was qualified for her position and that no position was eliminated during the relevant time period.  Defendants argue that Plaintiff's transfer to Trementina was not an adverse action.  Defendants further contend that the decision to transfer Plaintiff to Trementina while filling her vacancy at Ventana with Nicole Calderon and the decision to terminate Plaintiff's employment were based on legitimate, nondiscriminatory reasons and were not a pretext for discrimination.

A.      Was Plaintiff's Transfer From the Ventana Subdivision to the Trementina
        Development an Adverse Employment Action?

The Tenth Circuit liberally defines the phrase "adverse employment action," Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998), and takes a case-by-case approach in determining whether a given employment action is adverse.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998).  In this circuit, conduct that will be considered an adverse employment action includes but is not necessarily limited to conduct that results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Hillig v. Rumsfeld, 381 F.3d 1028, 1032-33 (10th Cir. 2004); see also Tran v. Trustees of the State Colleges in Colo., 355 F.3d 1263 (10th Cir. 2004); Wells v. Colorado Dep't of Transp., 325 F.3d 1205, 1213 (10th Cir. 2003);. Garcia v. Pueblo Country Club, 299 F.3d 1233, 1241 (10th Cir.2002); Aquilino v. Univ. of Kan., 268 F.3d 930, 934 (10th Cir. 2001). There are deprivations less harsh than dismissal that will be considered adverse or detrimental employment actions. Lybrook v. Farmington Mun. Schools Bd. of Educ., 232 F.3d 1334, 1340 (10th Cir. 2000). However, such actions by an employer are adverse employment actions only when they have a

21

demonstrable adverse impact on future employment opportunities or when the adversely affect an

employee's job position.  See Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996);

McKenzie v. Atlantic Richfield Co., 906 F.Supp. 572, 575 (D. Colo. 1995).  A mere

inconvenience or alteration of job responsibilities is not an adverse employment action.  Sanchez,

164 F.3d at 532.  Generally, a lateral transfer will not be an adverse employment when it does not

alter an employee's salary, benefits or responsibilities  See Id.

      For purposes of the motion for summary judgment, Defendants do not dispute that

Plaintiff's termination was an adverse employment action.  However, Defendants urge that

Plaintiff's transfer was not an adverse employment action because Plaintiff merely relocated from

one site to another and remained a sales agent with the same commission schedule.  Defendants

contend that Plaintiff requested the transfer and that, in any event, Plaintiff's employment contract

specifically allowed Defendants to transfer her to other sites at Defendants' absolute discretion.

      Defendants' argument misses the mark.  First, the lateral transfer in this case was one

which indisputably altered Plaintiff's salary and benefits.  She was moved from a subdivision in

which she was a top sales person to a subdivision that was not ready for sales and consequently

had a severe reduction in her income.  There is a fact issue with regard to whether the transfer

was voluntary.  The fact that Plaintiff had expressed an interest in transferring to a subdivision

closer to her home was not necessarily a blanket invitation to move her to any empty piece of

property on which a subdivision might one day exist.

      Finally, an employment contract permitting an employer to take a particular action with

regard to an employee does not give the employer carte blanche - the employer still may not take

action with regard to the employee for an unlawful, discriminatory reason.  An employee in an "at

will" employment relationship may be terminated for any reason or no reason at all.  Miller v.

Automobile Club Of New Mexico, Inc., 420 F.3d 1098, 1128 (10th Cir. 2005).  However, an "at

will" employee who is terminated for an unlawful discriminatory reason such as race, age or

gender may bring an action against the employer.  See, e.g., Perry v. Woodward, 199 F.3d 1126,

1132-33 (10th Cir. 1999) ("at will" employee had the right to bring Section 1981 claim alleging

termination because of race); Andersen v. McCotter, 100 F.3d 723, 726 (10th Cir. 1996) ("at

will" volunteer at government agency could not be terminated in violation of her First Amendment

rights).  Because an employer with the right to terminate an employee for any reason at all cannot

do so for an unlawful discriminatory reason, it stands to reason that an employer may not take

actions authorized by an employment contract for discriminatory reasons.

 The Court cannot determine, as a matter of law, that Plaintiff's transfer was not an

adverse employment action.  Accordingly, such a determination cannot form the basis for

summary judgment in favor of Defendants.

 B. Have Defendants Produced a Facially Legitimate, Non-Discriminatory Reason for
the Adverse Actions Taken With Respect to Plaintiff?

 Defendants' burden to articulate a legitimate non-discriminatory reason for taking an

adverse action is a burden of production rather than persuasion.  Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 255-56 n.8 (1981).  Accordingly, Defendant need only present some

evidence of nondiscriminatory reasons.  Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 510-11 (1993).

 With regard to Plaintiff's transfer, replacement and termination, Defendants urge that they

had legitimate, nondiscriminatory reasons for these decisions.  Defendants' proffered reason for

transferring Plaintiff to Trementina is Plaintiff's own request for a transfer.  Defendants assert that

Plaintiff was offered an opportunity to return to Ventana but declined.  Defendants contend that

Nicole Calderon was transferred into Plaintiff's vacant position at Ventana because of her prior

experience at Ventana.  With regard to Plaintiff's termination, Defendants assert that Plaintiff was

fired for insubordination.

Having produced evidence in support of these legitimate, nondiscriminatory reasons for

their decisions, Defendants have met their burden of production.  The burden thus shifts to

Plaintiff to show that Defendants' articulated reasons are a pretext for discrimination.

      C.     Does Plaintiff's Evidence Create a Genuine Issue of Material Fact With Regard to
           Defendants' Motives Such that a Reasonable Jury Could Find that Defendants'
           Proffered Reasons are a Pretext for Discrimination.

Plaintiff bears the burden of rebutting Defendants' articulated reasons for its actions and

showing that these reasons are a pretext for discrimination.  Ingels v. Thiokol Corp., 42 F.3d 616,

622 (10th Cir. 1994).  In order to show pretext, a plaintiff  is required to show that the

defendant's tendered reason for the employment decision was not the genuine motivating reason,

but rather was a disingenuous or sham reason.  Burn v. Bd. of County Com'rs of Jackson County,

330 F.3d 1275, 1283 (10th Cir. 2003).  Plaintiffs typically show pretext by revealing "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

unworthy of credence." Jones v. Barnhart, 349 F.3d 1260, 1266 (10th Cir. 2003).  A plaintiff

need not always present additional evidence in order to show pretext; a plaintiff's prima facie case

may itself cast sufficient doubt on defendants' proffered nondiscriminatory reason to satisfy her

burden of showing pretext. English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001).

Plaintiff's evidence shows that Eberle made two comments that could be construed as age related in late August or early September 2003.  Eberle also told Plaintiff that she would be terminated if she did not do light maintenance requiring the use of a ladder in spite of her bad knees.  While this statement is not directly age related, a reasonable jury could believe that it was made on the basis of Plaintiff's age and reflected age-related animus.  Plaintiff's evidence suggests that she was transferred to Trementina in spite of her reservations that it was not ready to sell and that she was not an employee of Raylee.  Additionally, Plaintiff was transferred early in order to create a vacancy at Ventana and facilitate Nicole Calderon filling that vacancy.[5]  While Defendants produce evidence that Plaintiff's transfer was based on her own request and Plaintiff was free to return to Ventana, Plaintiff presents contrary evidence that the transfer was not voluntary and that she was not given the choice of returning to Ventana.  With regard to Defendants' evidence that Plaintiff was terminated for insubordination, Plaintiff presents evidence suggesting this is false by showing that Pizzonia and Grady believed Plaintiff had resigned and later believed she had been fired for abandoning her job by walking out on Eberle during their last encounter.  Plaintiff has shown sufficient inconsistencies in Defendants' proffered reasons to create a fact issue with regard to whether Defendants' proffered reasons are a pretext for

---

[5]The parties appear to assume for purposes of this motion that Plaintiff's replacement at Ventana by Nicole Calderon gives rise to an inference of discrimination on the basis of age.  The Court will also assume for purposes of this motion that Nicole Calderon's replacement of Plaintiff at Ventana is evidence of discrimination on the basis of age.

25

discrimination.  Accordingly, Defendants are not entitled to summary judgment with regard to Plaintiff's age discrimination claim in Count III.

III.    PLAINTIFF'S RETALIATION CLAIM

Title VII makes it unlawful to retaliate against an employee because she has "opposed" any practice made unlawful by Title VII, or because she has "participated . . . in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).   The ADEA's anti-retaliation provision forbids an employer from discriminating against an employee because she "has opposed any practice made unlawful" by the statute, or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the statute. 29 U.S.C. § 623(d). The anti-retaliation provisions of Title VII "are materially identical" to the ADEA's provisions. Twisdale v. Snow, 325 F.3d 950, 952 (7th Cir.), cert. denied, 540 U.S. 1088 (2003). Retaliation claims under Title VII and under the ADEA are analyzed under the burden shifting framwork set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  See Annett v. University of Kansas, 371 F.3d 1233 (10th Cir. 2004) (Title VII case); Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1507 (10th Cir.1996) (ADEA case).  To state a prima facie case of retaliation, plaintiff bears the initial burden of showing (1) that she engaged in protected activity; (2) that the Defendants took adverse employment action against her; and (3) that there exists a causal connection between the protected activity and the adverse action.  Tran v. Trustees of the State Colleges in Colo., 355 F.3d 1263 (10th Cir. 2004).  Once Plaintiff makes this showing, Defendants must articulate a facially legitimate, nondiscriminatory reason for the adverse employment action.  Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1212

(10th Cir. 2003).  Plaintiff must then respond by showing that the Defendants' asserted reasons for the adverse action are pretextual.  Id.

Defendants assert that Plaintiff cannot make a prima facie showing of retaliation because she cannot show that she engaged in protected activity.  Defendants do not otherwise contest Plaintiff's ability to make a prima facie showing of retaliation.  However, Defendants argue that they terminated Plaintiff for legitimate, nondiscriminatory reasons that are not a pretext for discrimination.

Informal complaints to superiors opposing conduct unlawful under Title VII or the ADEA constitute protected activity for purposes of a Title VII or ADEA retaliation action.  O'Neal v. Ferguson Const. Co., 237 F.3d 1248 (10th Cir. 2001).  However, an employer cannot engage in retaliation unless it is aware that an employee is engaging in or has initiated **protected** conduct.  Petersen v. Utah Dept. of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002).  Thus, a plaintiff is precluded from a retaliation claim if she has failed to mention or make any reference to unlawful discrimination.  Id.

Plaintiff alleges that her December 15, 2003 letter is protected activity because it clearly raises the issue of age discrimination.  Plaintiff also alleges that she engaged in protected activity on the day she was terminated when she told Eberle that she was going to file a grievance with Grady and that she had already called him.  Defendants argue that the December 15 letter does not raise the issue of age discrimination because it only asks rhetorically whether she was being treated badly because of her age.  Defendants contend that Plaintiff's conduct on the day she was fired was not protected activity because she did not actually mention discrimination in her voicemail message to Grady.

In her December 15 letter, Plaintiff did not give any information on why she believed she might be the victim of age discrimination.   However, the letter clearly sets out various problems Plaintiff felt she was having in her job because of Eberle and asks whether these problems are being visited upon her because of her age.  This qualifies as protected activity.

None of Plaintiff's conduct on the day she was fired makes reference to unlawful discrimination.  Plaintiff contends that she intended to complain of discrimination to Grady, but she acknowledges that she made no mention of unlawful discrimination in her message to him. Thus, Plaintiff's comments to Grady in the voicemail are not protected activity.

Similarly, Plaintiff's comment to Eberle that she was filing a grievance against him and had already placed a call to Grady made no mention of unlawful discrimination.  In Petersen, the plaintiff alleged she was retaliated against by her supervisor after he learned that she had complained about his conduct to the prison warden's wife.  301 F.3d 1182 (10th Cir. 2002). However, the plaintiff never made any reference to unlawful discrimination in her complaint.  The Tenth Circuit held that the plaintiff's retaliation claim was precluded by her failure to mention unlawful discrimination because an employer cannot engage in retaliation if it does not know that a person has opposed a violation of an anti-discrimination law.  Petersen, 301 F.3d at 1188.

By Plaintiff's own testimony, Eberle had no reason to know that the complaint Plaintiff was preparing to make concerned **unlawful** discrimination.  Thus, even if Eberle fired Plaintiff to prevent her from making a complaint, Eberle had no reason to know that Plaintiff's intended complaint was protected activity and that firing her would violate the law.  Accordingly, Plaintiff's remark to Eberle that she was going to file a grievance was not protected activity as a matter of law.

28

Having found that Plaintiff's December 15 letter was protected activity, and Defendants not having otherwise disputed Plaintiff's ability to make a prima facie showing of retaliation at the summary judgment stage, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.  Defendants contend that Plaintiff was terminated for insubordination and have met their burden of producing evidence of this nondiscriminatory reason.  However, as noted in the analysis of Plaintiff's discrimination claim, Plaintiff has presented sufficient evidence of inconsistencies in Defendants' reasons to create a dispute of fact on the issue of pretext.  Accordingly, Defendants are not entitled to summary judgment on Plaintiff's retaliation claim in Count IV.

IV.    PLAINTIFF'S CLAIM FOR INTERFERENCE WITH BUSINESS RELATIONS

Under New Mexico law, to establish the tort of interference with a contract, a plaintiff must prove that, (1) defendant had knowledge of the contract between plaintiff and a third party; (2) performance of the contract was refused; (3) defendant played an active and substantial part in causing plaintiff to lose the benefits of his contract; (4) damages flowed from the breached contract; and (5) defendant induced the breach without privilege or justification to do so. Ettenson v. Burke, 2001-NMCA-003, 17 P.3d 440, 446 (N.M. App. 2000).  Under the common law, a servant who caused the breach of his master's contract was absolutely immune from an action for tortious interference with a contract.  See Id.  However, New Mexico only recognizes a qualified privilege for corporate officers and other agents to interfere with a principal's contract, and the privilege only applies when the agent acts in good faith and in the best interest of the principal as opposed to his own private interests.  Id. at 446-47.  Importantly for purposes of

summary judgment analysis, whether an agent's act are privileged is an issue of fact, and a defendant bears the burden of proving privilege as an affirmative defense. Id. at 447, 448.

A supervisor who interferes with his subordinate's employment contract with a discriminatory motive is not acting in the best interests of his employer but is acting for his own interests. See Id. at 447 (noting that a supervisor who fires a subordinate for spurning sexual advances is not privileged to interfere with the employment contract). There is a fact issue with regard to Eberle's motive in terminating Plaintiff's employment. Defendants have not met their burden of proving their affirmative defense at the summary judgment stage and are not entitled to summary judgment on Plaintiff's claim for Tortious Interference with Business Relations in Count V.

V.      PLAINTIFF'S CLAIM OF UNJUST ENRICHMENT

Plaintiff's Complaint alleges that she had an employment contract with Vantage for the period between February 3, 2003 through January 1, 2004. Complaint ¶ 9. She further alleges that Vantage retained commissions owed to Plaintiff after she was terminated. Complaint ¶ 57. Plaintiff's Complaint asks that Vantage pay Plaintiff the amount of the commissions owed. ¶ 60. Thus, Plaintiff's Complaint alleges that there was a contract, that Vantage wrongfully withheld commissions that it owed to Plaintiff, and that Vantage should pay the money it owes. While Plaintiff called this claim a claim of "unjust enrichment," it does not, in fact, state a claim for unjust enrichment. This is because, as Defendants correctly point out, a claim of unjust enrichment arises in equity and cannot exist where the parties are in privity of contract. Elliott Indus. Ltd. Partnership v. BP Am. Prod. Co., 407 F.3d 1091, 1117 (10th Cir. 2005). Plaintiff's Complaint in actuality states a claim for breach of contract.

The problem in this case arises from the fact that Plaintiff has given her claim the title "unjust enrichment" instead of calling it a claim for "breach of contract."  Defendants contend that they are entitled to summary judgment because, of course, Plaintiff cannot bring a claim of unjust enrichment given the contract between the parties.  This raises the issue whether the Court should treat Plaintiff's claim as one for unjust enrichment because of its title notwithstanding the factual allegations underlying the claim (in which case Defendants are entitled to summary judgment) or whether the Court should treat Plaintiff's claim as one for breach of contract because of the factual allegations notwithstanding the title (in which case summary judgment would be denied).

Under Federal Rules of Civil Procedure Rule 8 notice pleading, the title of a claim is not as important as the facts alleged to support the claim so long as Defendants have had fair notice of the claim.  See Conley v. Gibson, 355 U.S. 41, 47 (1957) (Rule 8 of the Federal Rules of Civil Procedure requires only that a plaintiff give a short and plain statement giving fair notice of the claim); Swierkiewicz v. Sorema, 534 U.S. 506, 514 (2002) (a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the **allegations**) (emphasis added).  It is clear from the Defendants' submissions that they understand Plaintiff's Complaint as alleging that Defendants have failed to pay commissions in accordance with a contract between the parties.  Accordingly, Defendants have had fair notice of a claim for breach of contract.  The Court will not elevate form over substance by granting summary judgment to Defendants because Plaintiff misnamed her claim, and Defendants' motion for summary judgment with regard to this claim is denied.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 29) is hereby GRANTED IN PART in that:

1.      Summary Judgment is GRANTED in favor of Defendants with regard to Plaintiff's claims of Harassment under Title VII and the ADEA in Counts I and II;

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 29) is hereby DENIED IN PART in that:

2.      Summary Judgment is DENIED with regard to Plaintiff's claim for age discrimination under the ADEA in Count III.

3.      Summary Judgment is DENIED with regard to Plaintiff's claim of retaliation in Count IV.

4.      Summary Judgment is DENIED with regard to Plaintiff's claim of Tortious Interference with Business Relations in Count V.

5.      Summary Judgment is DENIED with regard to Plaintiff's claim for Unjust Enrichment in Count VI.

UNITED STATES DISTRICT JUDGE